IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ANA MUNOZ and
MICHAEL TILLEY,
*on behalf of themselves
and all others similarly situated*,

        Plaintiffs,

v.                                                                No.

WELLS FARGO BANK, N.A.;
CONDUENT STATE & LOCAL SOLUTIONS, INC.; and
CONDUENT BUSINESS SERVICES, LLC,

        Defendants.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

        Plaintiffs Ana Munoz and Michael Tilley, by their attorneys, bring the following Class Action Complaint on behalf of themselves and all others similarly situated and allege and complain of Defendant Wells Fargo Bank, N.A., Conduent State & Local Solutions, Inc. and Conduent Business Services, LLC as follows:

**Preliminary Statement**

    1.    Ana Munoz and Michael Tilley (collectively, "Plaintiffs") are the victims of fraud.

    2.    Defendants Wells Fargo Bank, N.A., Conduent State & Local Solutions, Inc., and Conduent Business Services, LLC (collectively, "Defendants") issued an EPPICard prepaid Visa card ("EPPICard") to Plaintiffs.

    3.    EPPICards are refillable prepaid debit cards, which are linked to limited purpose subaccounts ("Accounts") maintained by Defendants.

4. The Accounts contain funds owed to Plaintiffs by the State of New Mexico for unemployment insurance, child support, and foster care maintenance.

5. Each of the Plaintiffs' Accounts contained thousands of dollars on deposit.

6. By unknown means, perpetrators gained access to the accounts and commenced a series of fraudulent unauthorized transactions, draining nearly all funds from the Accounts without the consent, knowledge, or authorization of Plaintiffs.

7. Following discovery of the unauthorized transactions, each of the Plaintiffs disputed the fraudulent charges with Defendants.

8. Despite their obligation under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C § 1693, *et seq.*, to promptly credit the Accounts, Defendants refused to credit the amounts of the stolen funds and associated fees for the transactions charged to the Accounts by the Defendants.

9. Plaintiffs bring claims against Defendants for violations of the EFTA, which protects consumers from liability for such unauthorized transfers.

10. Financial institutions are barred under the EFTA from holding a consumer and accountholder liable for unauthorized use for any reason that is not specifically set forth in the statute.

11. As set forth herein, Defendants' error resolution process and form correspondence violate the EFTA:  Defendants have an overt policy of denying claims where they, the financial institutions, cannot confirm that a fraud occurred.

12. Defendants' error resolution process violates the EFTA by explicitly placing the burden of proving the unauthorized transfer on the consumer and denying disputes on grounds that the consumer has not met his or her burden of proving that the transaction was unauthorized.

13. The EFTA requires the opposite, providing that Defendants are liable for disputed transactions where the Defendants cannot show that the transactions were in fact authorized.

14. Plaintiffs also brings claims under New Mexico Unfair Practices Act ("UPA"), NMSA § 57-12-1 *et seq*.

15. Plaintiffs seek to represent a class to remedy the harm caused by Defendants' illegal behavior and to ensure that these practices cannot continue going forward.

## Parties

16. Plaintiff Ana Munoz is a natural person residing in Albuquerque, New Mexico.

17. Plaintiff Michael Tilley is a natural person residing in Taos, New Mexico.

18. Plaintiffs are "consumers" as that term is defined by 15 U.S.C. § 1693a(6), and the accounts at issue were used for personal, family or household purposes.

19. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a federally chartered bank.

20. Wells Fargo is the issuer of the EPPICards to Plaintiffs in this action.

21. Defendant Conduent State & Local Solutions, Inc. ("Conduent Inc.") is a New York corporation.

22. Defendant Conduent Business Services, LLC ("Conduent LLC") is a Delaware limited liability company.

23. Conduent Inc. and Conduent LLC together ("Conduent") acted as the program manager with respect to the EPPICards and associated accounts at issue in this action.

24. Conduent provides business process services, including digital payments, claims processing, benefit administration, and regulatory compliance.

25. At all relevant times, all Defendants were "financial institutions" as that term is defined by 15 U.S.C. § 1693a(9).

## Jurisdiction and Venue

26. The Court has jurisdiction under the EFTA, 15 U.S.C. § 1693m, and under 28 U.S.C. §§ 1331.

27. This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this case is a class action, the classes have more than 100 members, the amount in controversy exceeds $5,000,000, and Plaintiffs are citizens of a different state than Defendants.

28. The Court has jurisdiction over Plaintiffs' claims for declaratory relief under 28 U.S.C. § 2201.

29. This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this Complaint occurred within the district, and Defendants regularly conduct business here.

## Facts

### Defendants Administer "EPPICard" Accounts that Receive Crucial State Benefits and Other Payments

31. The State of New Mexico contracted with Defendants to create the New Mexico EPPICard program.

32. The EPPICard is a prepaid Visa debit card linked to a subaccount held by Defendants.

33. EPPICard accounts are "accounts" as that term is defined by 15 U.S.C. § 1693a(2).

34. New Mexico uses the EPPICard accounts to deliver payments of unemployment insurance, child support, and foster care maintenance.

35. Unemployment insurance is a non-means-tested benefit administered by New Mexico Department of Workforce Solutions ("DWS").

36. The purpose of unemployment insurance is to provide "benefits to people who are out of work through no fault of their own."[1]

37. Unemployment insurance was particularly important during the COVID-19 pandemic, with over 100,000 New Mexicans receiving benefits at any given time during the first year of the pandemic.[2]

38. Child support is not a government benefit and is non-means-tested.

39. The New Mexico Human Services Department's Child Support Enforcement Division ("CSED") collects child support from non-custodial parents.

40. The goal of Child Support Enforcement is "to maximize the collection of child support for all New Mexico children."[3]

41. New Mexico collects more than $100 million per year in child support.[4]

42. Foster care maintenance is a non-means tested benefit administered by the New Mexico Children, Youth and Families Department ("CYFD").

43. Foster care maintenance supports foster parents in providing "safety and nurturance to children who cannot live at home with their families because it is not a safe place for them."[5]

---

[1] https://www.dws.state.nm.us/Unemployment
[2] https://www.santafenewmexican.com/news/business/unemployment-in-new-mexico-jan-4-2022/article_1be7bb60-56b0-11ec-971c-077bfd591c6f.html
[3] https://www.hsd.state.nm.us/about_the_department/child_support_enforcement_division/
[4] https://www.nmlegis.gov/Entity/LFC/Documents/Agency_Report_Cards/630%20-%20HSD%20Q4%20FY22%20Rpt%20Card%20FINAL.pdf
[5] https://cyfd.org/foster-care

44. In New Mexico, about 2,000 children are in foster care at any given time.[6]

45. Unemployment insurance, child support, and foster care maintenance are crucial in supporting the most vulnerable people in New Mexico.

46. Funds from these programs are deposited into the EPPICard Account, and the EPPICard can be used at merchants and banks like any other Visa card.

47. The EPPICard is issued by Wells Fargo.

48. Conduent is the program manager for the EPPICard and describes itself as the "payment solutions provider" for the EPPICard.

49. Conduent controls central and basic aspects of the EPPICard, including all consumer-facing functions.

50. Conduent sends the EPPICard to the consumer when the account is created.

51. Conduent sends periodic statements of account to consumers.

52. Conduent handles all customer service issues relating to EPPICards.

53. For example, when a consumer alleges that an unauthorized electronic fund transfer has occurred, Conduent handles the dispute process.

54. Wells Fargo refers any such complaints – along with all other customer services issues with EPPICard – to Conduent.

55. Wells Fargo has no process for resolving disputes relating to unauthorized electronic fund transfers on EPPICards.

56. Defendants operate as a joint venture or enterprise whose actions include the transactions with Plaintiffs and class members, including, without limitation:

---

[6] https://cyfd.org/docs/360ANNUAL_FY22_FINAL.pdf

    a.    They shared a community of interest with the object or purpose of administering the EPPICard program;

    b.    They shared control over common business activities;

    c.    They shared management and employees; and

    d.    They shared profits and losses.

57. Defendants also operate as agents of each other, and they are vicariously liable for each other's conduct.

58. Defendants authorized, participated in, and ratified the misconduct described herein.

59. Defendants' employees acted in the scope of their employment in the conduct described herein.

60. Defendants are jointly and severally liable for the misconduct described in this Complaint.

### Thousands of Dollars Are Stolen from Ana Munoz's EPPICard Account

61. Plaintiff Ana Munoz's son was born in 2015.

62. The father refused to provide support for his child.

63. Ms. Munoz works full time as a receptionist, but raising a child placed a severe strain on her finances.

64. Ms. Munoz applied for assistance through CSED.

65. In approximately 2017, Ms. Munoz started receiving child support payments.

66. The payments were paid into an EPPICard account, and Ms. Munoz was issued an EPPICard.

67. Ms. Munoz never withdrew funds from the EPPICard, allowing the benefits to accrue in the EPPICard account with the intention of one day to transfer the funds to her son.

68. By early 2022, more than $5,000 had accrued in Ms. Munoz's EPPICard account.

69. When Ms. Munoz received her January 2022 EPPICard statement, she was shocked to discover $5,550 in unauthorized transactions and associated fees charged by Defendants, leaving only $34 remaining in the account.

70. Ms. Munoz was deeply distressed to learn that all of the money she had saved for years to benefit her son had vanished.

71. Ms. Munoz had no knowledge of and did not consent to any of the transfers.

72. Ms. Munoz never provided her EPPICard, code, or any other means of access to the EPPICard account to any other person.

73. The transactions were obviously fraudulent, many of them apparently involving a Lithuanian cryptocurrency exchange.

74. The transfers of funds from Ms. Munoz's EPPICard account constituted "electronic fund transfers" as that term is defined by 15 U.S.C. § 1693a(7).

75. Upon discovery the fraudulent transfers, Ms. Munoz immediately contacted EPPICard to report the unauthorized electronic fund transfers.

76. EPPICard requested that Ms. Munoz complete a written "Questionnaire of Fraud," which she promptly submitted.

77. On April 26, 2022, the EPPICard Fraud Services Department responded by letter, stating that it had "completed our investigation of your claim."

78. The letter went on to state that "we cannot confirm that fraud occurred. Our investigation indicates that you entered into an agreement with the merchant."

79. This statement was a baseless lie and Defendants had no evidence to support it.

80. Defendants had absolutely no basis to assert that Ms. Munoz had "entered into an agreement with the merchant."

81. Defendants did not make a good-faith investigation into Ms. Munoz's dispute.

82. Defendants did not have a reasonable basis for believing that the EPPICard Account transfers were not in error.

83. Defendants never refunded or issued a credit for any of the money stolen from Ms. Munoz's EPPICard account.

84. Ms. Munoz filed a police report, called CSED, and even attempted to contact the "merchants" shown on the EPPICard account statement, but to no avail.

85. Ms. Munoz was damaged by Defendants' misconduct, including the loss of $5,550.

## Thousands of Dollars Are Stolen from Michael Tilley's EPPICard Account

86. Plaintiff Michael Tilley was working in a Taos, New Mexico restaurant when the COVID pandemic began.

87. Mr. Tilley was laid off with no prospect of rehire, and his living expenses immediately began eating away at his modest savings.

88. In the Spring of 2020, Mr. Tilley applied for unemployment benefits.

89. His unemployment benefits were subsequently paid into an EPPICard account, and Mr. Tilley was issued an EPPICard.

90. Mr. Tilley allowed the benefits to accrue in the EPPICard account while he first used his savings for everyday expenses.

91. Mr. Tilley received benefits for more than a year, and as of February, 2022, he had more than $13,300 in the EPPICard Account.

92. His savings had dwindled to less than $1,000, and Mr. Tilley planned to begin using the EPPICard funds to pay for necessities, including the purchase of a used car.

93. On March 8, 2022, Mr. Tilley went to a U.S. Bank location in Taos to withdraw money from his EPICCARD account and discovered the account balance was $3.17.

94. Mr. Tilley was shocked and upset to learn that the vast majority of his savings had disappeared.

95. Mr. Tilley reviewed his account statement and saw more than $13,000 in fraudulent transfers and associated fees charged by Defendants.

96. Mr. Tilley had no knowledge of and did not consent to any of the transfers.

97. Mr. Tilley never provided his EPPICard, code, nor any other means of access to the EPPICard account to any other person.

98. The transactions were obviously fraudulent, many of them apparently involving an Estonian cryptocurrency exchange.

99. The transfers of funds from Mr. Tilley's EPPICard account constituted "electronic fund transfers" as that term is defined by 15 U.S.C. § 1693a(7).

100. Mr. Tilley immediately contacted EPPICard to report the unauthorized electronic fund transfers.

101. EPPICard requested that Mr. Tilley complete a written "Questionnaire of Fraud," which he promptly submitted.

102. On March 9, 2022, EPPICard responded by letter, stating that it had "completed our investigation of your claim."

103. The letter went on to state that "we cannot confirm that fraud occurred. Our investigation indicates that you entered into an agreement with the merchant."

104. This statement was a falsehood, just as it was when Defendants made it verbatim to Ms. Munoz.

105. Defendants had absolutely no basis to assert that Mr. Tilley had "entered into an agreement with the merchant."

106. Defendants did not make a good-faith investigation into Mr. Tilley's dispute.

107. Defendants did not have a reasonable basis for believing that the EPPICard account transfers were not in error.

108. Defendants never refunded or issued a credit for any of the money stolen from Mr. Tilley's EPPICard account.

109. Mr. Tilley made numerous other attempts to remedy the situation, making police reports, communicating with DWS, contacting the New Mexico Attorney General, and reaching out to New Mexico's Congressional delegation, but all to no avail.

110. Mr. Tilley was damaged by Defendants' misconduct, including the loss of $13,301.58.

### Defendants Know That Many EPPICard Accounts Were Compromised

111. Ms. Munoz and Mr. Tilley were far from the only consumers affected by unauthorized electronic fund transfers from EPPICard accounts containing unemployment benefits, child support, and foster care maintenance.

112. During the same time period, money was stolen from numerous EPPICard accounts due to Defendants' failures to adequately to safeguard the funds.

113. Defendants were aware of the unauthorized electronic fund transfers, both through consumer complaints and through their own internal controls.

114. Yet Defendants continued to hold consumers liable for unauthorized electronic fund transfers in flagrant disregard of federal law.

115. The EFTA was enacted to protect "individual consumer rights" affected by electronic fund transfers. 15 U.S.C. § 1693.

116. One of the EFTA's fundamental protections is the provision stating, absent an enumerated exception: "a consumer incurs no liability from an unauthorized electronic fund transfer." 15 U.S.C. § 1693g(e).

117. Defendants egregiously failed in these and other obligations under EFTA.

118. Under federal law, Defendants were obligated to refund all of the money taken from Ms. Munoz, Mr. Tilley, and the many other vulnerable New Mexicans who lost crucial benefits due to Defendants' failure to secure the EPPICard accounts.

## Class Allegations

119. Plaintiffs bring this claim on behalf of themselves, and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

120. Plaintiffs seek to represent an EFTA Class and a New Mexico Unfair Practices Act Class (collectively, "the Classes").

121. The EFTA Class is defined as follows:

   a. all persons in the United States who currently have or previously had a New Mexico EPPICard Visa Prepaid Card account; and

   b. notified Defendants they disputed one or more charges on their account; and

    c. within one year of the commencement of this action, were sent or received a response from Defendants that denied the dispute; and:

    d. whose dispute was denied, in sum or substance, based on the stated grounds that Defendants could not confirm or determine that the disputed transaction(s) were fraudulent or otherwise unauthorized.

122. The New Mexico Unfair Practices Act Class is defined as follows:

    a. all persons in the United States who currently have or previously had a New Mexico EPPICard Visa Prepaid Card account; and

    b. notified Defendants they disputed one or more charges on their account; and

    c. within four years of the commencement of this action, were sent or received a response from Defendants that denied the dispute; and:

    d. whose dispute was denied, in sum or substance, based on the stated grounds that Defendants could not confirm or determine that the disputed transaction(s) were fraudulent or otherwise unauthorized.

123. Excluded from the Classes are anyone employed by counsel for Plaintiffs in this action and any Judge to whom this case is assigned, as well as his or her immediate family and staff.

*Numerosity*

124. As set forth above, there are thousands of people who received unemployment insurance, child support, and foster care maintenance from New Mexico through the EPPICard program.

125. As set forth above, when responding to these disputes Defendants issued form communications that Plaintiffs allege violate the law.

126. These standardized communications reflect generalized policies and procedures that Plaintiffs allege violate the law.

127. Thus, there are undoubtedly many thousands of customers that have already been victims of Defendants' unlawful communications, policies and practices.

128. Further, there are millions of consumers that will be subject to these unlawful communications, policies and practices in the future.

129. As such, the Classes are sufficiently numerous that joinder of all members is impracticable.

130. Although the exact number of members of the Classes and their addresses are unknown to Plaintiffs, they are readily ascertainable from Defendants' records.

*Existence and Predominance of Common Questions*

131. Common questions of law and fact exist as to Plaintiffs and all members of the Classes and predominate over questions affecting only individual members of the Classes.

132. These common questions include:

   a. Whether Defendants have a standardized practice of denying disputed transactions by consumers unless the consumer establishes the transactions were not authorized.

   b. Whether Defendants' denial of disputes on the stated grounds that they could not confirm or determine that the disputed transaction(s) were fraudulent or otherwise unauthorized is unlawful under the EFTA and/or New Mexico law.

   c. Whether Defendants' denial of disputes with an explanation that the denial is based upon a failure of the consumer to provide information, which is not actually required, is an unlawful and unfair trade practice under New Mexico law.

*Typicality*

133. Each Plaintiff has claims that are typical of the claims of at least one of the Classes because each Plaintiff is a member of one or more of the Classes and is subject to the same unlawful conduct as other members of the Classes.

134. Thus, Plaintiffs' claims—based on the same facts and legal theories as the claims of all other members of the Classes—are typical of the claims of the Classes.

*Adequacy*

135. Plaintiffs will fairly and adequately represent the interests of the members of the Classes.

136. Plaintiffs' interests do not conflict with the interests of the members of the Classes they seek to represent.

137. Plaintiffs have retained counsel experienced in prosecuting class actions and in consumer protection matters.

138. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

*Superiority*

139. A class action is superior to other available means for the fair and efficient adjudication of the claims at issue.

140. The damages suffered by each individual member of the Classes may be limited.

141. Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

142. Further, it would be virtually impossible for each individual member of the Classes to redress the wrongs done to them.

Case 1:23-cv-00202-LF-SCY   Document 1   Filed 03/08/23   Page 16 of 19

143. Even if the members of the Classes themselves could afford such individual litigation, the court system could not.

144. Individualized litigation presents a potential for inconsistent or contradictory judgments.

145. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.

146. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

147. In the alternative, the Classes may be certified because:

   a. the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants;

   b. the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

   c. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## **FIRST CLAIM FOR RELIEF**
**(Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*)**

148. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

149. The EFTA places sharp limitations on consumer liability for unauthorized transactions. *See* 15 U.S.C. § 1693g ("Consumer liability"); 12 C.F.R. § 1005.6 ("Liability of consumer for unauthorized transfers").

150. Moreover, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

151. Specifically, pursuant to Section 1693g(b), it is Defendants' burden to prove that the disputed transfer was authorized:

> (b) BURDEN OF PROOF.--In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met, and, if the transfer was initiated after the effective date of section 905, that the disclosures required to be made to the consumer under section 905(a)(1) and (2) were in fact made in accordance with such section.

152. However, Defendants are explicit in their reversal of that burden, regularly denying claims on grounds that they "cannot confirm that fraud occurred."

153. Defendants acts and omissions set forth above constitute violations of the EFTA.

154. As a direct and proximate result of Defendants' violations of the EFTA, Plaintiffs are entitled to an award of statutory and actual damages as well as attorney's fees and costs.

155. Defendants' imposition of the burden of proof on the consumer contrary to statute constitutes a violation of 1693f(e), entitling Plaintiffs (and each member of the class) to treble damages.

### **SECOND CLAIM FOR RELIEF**
**(New Mexico Unfair Practices Act, NMSA § 57-12-1 *et seq.*)**

156. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

157. Defendants' misrepresentations and material omissions concerning consumer liability for unauthorized transfers and the burden imposed on consumers in disputing such transactions, violated the UPA, constituting both an unfair or deceptive trade practice and an unconscionable trade practice.  NMSA § 57-12-2(D) and (E).

158. Defendants' conduct was carried out in the regular course of their trade or commerce, as set forth above.

159. Defendants knew or in the exercise of reasonable diligence should have been aware that their statements were false or misleading.  *Russey v. Rankin*, 911 F.Supp. 1449, 1460 (D.N.M. 1995) (ruling that the "knowing" requirement is met "if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading").

160. Defendants willfully engaged in the illegal conduct alleged.

161. Plaintiffs and each member of the class sustained damages as a result of Defendants' violations of the UPA.

162. Plaintiffs and each member of the class are entitled to trebled statutory damages and/or actual damages plus costs and attorney fees.  NMSA § 57-12-10.

**WHEREFORE,** Plaintiffs seek judgment in their favor and damages against Defendants:

    A. An order certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing their attorneys as Class Counsel;

B.  An award of actual damages, treble damages, statutory damages, punitive damages, declaratory judgment, injunctive relief, attorney's fees and costs; and

C.  such other and further relief as may be necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated:  March 8, 2023

Respectfully submitted,

*/s/ Nicholas H. Mattison*
Nicholas H. Mattison
Feferman, Warren & Mattison
300 Central Ave., SW, Suite 2000 West
Albuquerque, New Mexico 87102
(505) 243-7773 phone
(505) 243-6663 fax
nmattison@nmconsumerwarriors.com

SCHLANGER LAW GROUP LLP
Daniel A. Schlanger *(pro hac vice forthcoming)*
Evan S. Rothfarb *(pro hac vice forthcoming)*
80 Broad Street, Suite 1301
New York, NY 10004
Telephone: (212) 500-6114
Facsimile: (646) 612-7996
Email: dschlanger@consumerprotection.net
Email: erothfarb@consumerprotection.net

*Attorneys for Plaintiffs and the Putative Class*