IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANA MUNOZ and MICHAEL TILLEY,
on behalf of themselves and all others
similarly situated,

    Plaintiffs,

v.                                                                                          1:23-cv-00202-LF-SCY

WELLS FARGO BANK, N.A.;
CONDUENT STATE & LOCAL
SOLUTIONS, INC.; and CONDUENT
BUSINESS SERVICES, LLC,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Renewed Motion to Compel Individual Arbitration, Enforce Class Action Waiver, and To Dismiss, or in the Alternative, Stay Proceedings Pending Arbitration, filed on May 5, 2023, by defendants Wells Fargo Bank, N.A., Conduent State & Local Solutions, Inc., and Conduent Business Services, LLC.  Doc. 29.  Plaintiffs Ana Munoz and Michael Tilley filed their response on May 19, 2023.  Doc. 31.  Defendants filed their reply on June 2, 2023.  Doc. 32.  The Court, having considered the submissions of the parties, finds that the motion is well taken in part and GRANTS it in part and DENIES it in part.

**I.  Background Facts**

New Mexico uses "EPPICard" accounts to deliver unemployment insurance benefits, child support payments, and foster care maintenance payments.  Doc. 21 at 6.  EPPICards are refillable, prepaid debit cards linked to accounts used to receive funds owed by the State of New

Mexico. Doc. 21 at 2, 6; Doc. 29 at 2, 6; Doc. 31 at 3. New Mexico contracted with Wells Fargo Bank, N.A. ("Wells Fargo") to administer the EPPICard program. Doc. 21 at 6. Wells Fargo entered into a subcontract with Conduent[1] to administer the EPPICard program to fulfill Wells Fargo's obligations to the State of New Mexico. Doc. 21 at 2; Doc. 29 at 2, 6; Doc. 31 at 3.

The State of New Mexico provided Conduent with the names and contact information for eligible recipients of unemployment insurance benefits, child support payments, and foster care maintenance. Doc. 21 at 7. Upon receipt, Conduent opened an account for the recipient and mailed the recipient a "Welcome Kit" that included the physical EPPICard and the Prepaid Debit Card Terms and Conditions ("Terms"). Doc. 29-2 at 2. The first paragraph of the Terms explains:

> These New Mexico Prepaid Debit Card Terms and Conditions (these "Terms") set forth the terms and conditions governing your use of the New Mexico Prepaid Debit Card (the "Card"). The Card is issued to you by Wells Fargo Bank, N.A. (also referred to in these Terms as "Bank," "we," or "us") on behalf of the State of New Mexico in connection with the State of New Mexico Department of Workforce Solutions ("State"). In these Terms, the words "cardholder," "you," and "your" refer to the person to whom the Card is issued or made available. The program manager for the Card is Conduent State & Local Solutions, Inc.

Doc. 29-3 at 1. The Terms notified the cardholder that

> The Card will be issued to the cardholder by Bank upon direction of State. IF YOU DO NOT WANT TO ACCEPT PAYMENTS BY MEANS OF THE CARD, PLEASE NOTIFY STATE IMMEDIATELY. By selecting your PIN and activating the Card in accordance with the instructions accompanying these

---

[1] Defendants explain that Conduent Business Services, LLC, is not properly named as a party in this lawsuit. Doc. 29 at 1, n.2. Conduent Business Services, LLC, is the parent company of Conduent State & Local Solutions, Inc., which is the entity that contracted with Wells Fargo to provide services related to the EPPICard program. *Id*. The Court will refer to Conduent Business Services, LLC, and Conduent State & Local Solutions, Inc., collectively as "Conduent." Whether Conduent Business Services, LLC, is correctly named in this lawsuit has no bearing on the matters decided in this opinion. This ruling applies to whichever entity is the correct defendant in this case.

>Terms, you agree to abide by these Terms.  Your use of the Card will be further evidence of your consent to these Terms.

*Id*.  The Terms also contain an arbitration agreement that states:

>20. DISPUTE RESOLUTION PROGRAM: ARBITRATION AGREEMENT.
>
>a. Binding Arbitration.  If you have a dispute with Bank, and you are not able to resolve the dispute informally, you and Bank agree that upon demand by either you or Bank, the dispute will be resolved by the arbitration process set forth in this Section.  You understand and agree that you and Bank are each waiving the right to a jury trial or a trial before a judge in a public court.  As the sole exception to this Arbitration Agreement, you and Bank retain the right to pursue in small claims court any dispute that is within the court's jurisdiction.  If either you or Bank fails to submit to binding arbitration following a lawful demand, the one who fails to so submit bears all costs and expenses incurred by the other compelling arbitration.
>
>b. Disputes.  A dispute is any unresolved disagreement between you and Bank.  It includes any dispute relating in any way to the Card or related services or matters described in these Terms; to your use of any of Wells Fargo's Banking locations or facilities; or to any means you may use to access Wells Fargo.  It includes claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims.  A dispute also includes any disagreement about the meaning, application or enforceability of this Arbitration Agreement.

*Id*. at 4.

Plaintiffs allege that as program manager, Conduent controls all the basic aspects of the EPPICard, including all consumer-facing functions.  Doc. 21 at 8.  Conduent sends statements to the consumers and handles all consumer service issues relating to the EPPICards.  *Id*.  Conduent handles all customer notices, disputes, and complaints concerning fraud or unauthorized use of the EPPICards and is responsible for any action taken.  *Id*.  Specifically, any disputes relating to unauthorized use of the EPPICard is Conduent's responsibility.  *Id*.

In 2017, Ms. Munoz began receiving child support payments for her son.  *Id*. at 8–9.  The payments were paid into an EPPICard account, and Ms. Munoz was issued an EPPICard.  *Id*. at

9. By early 2022, more than $5,000.00 had accrued in Ms. Munoz's EPPICard account. *Id*. When Ms. Munoz received her January 2022 EPPICard statement, however, she discovered that $5,550.00 in unauthorized charges and associated fees had left her only $34.00 remaining in the account. *Id*. Ms. Munoz reported the unauthorized charges, but her request for reimbursement was denied. *Id*. at 10.

In the spring of 2020, Mr. Tilley began receiving unemployment benefits from the State of New Mexico. *Id*. at 11. The benefits were paid into Mr. Tilley's EPPICard account, and Conduent issued Mr. Tilley an EPPICard. *Id.* Mr. Tilley received benefits for more than a year, and as of February 2022, he had accrued more than $13,000.00 in his EPPICard account. *Id*. When Mr. Tilley attempted to withdraw money from his EPPICard account in March of 2022, he discovered that the balance was $3.17. *Id*. Mr. Tilley reviewed his account statement, and more than $13,000.00 in unauthorized transfers and associated fees had been charged on the account. *Id*. Mr. Tilley reported the unauthorized transfers, but his request for reimbursement was denied. *Id*. at 12. Mr. Tilley did not recover the money from his EPPICard account. *Id*. at 12–13.

Ms. Munoz and Mr. Tilley initiated this lawsuit on March 8, 2023, on behalf of themselves and others similarly situated, alleging that defendants violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693 ("EFTA"), and the New Mexico Unfair Practices Act, § 57-12-1 et seq. ("UPA"), by failing to make a good-faith investigation into plaintiffs' disputes and for not having a reasonable basis for believing that the EPPICard account transfers were not in error. *Id*. at 10, 12, 14.

Defendants filed their motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16. Doc. 29 at 1. In their motion, defendants contend that because the Terms contain an arbitration agreement, a delegation clause, and a class action waiver provision,

4

plaintiffs must be compelled to arbitrate their claims on an individual basis, and this case either must be dismissed or stayed pending arbitration. *See generally* Doc. 29. Plaintiffs do not dispute that the Terms for the EPPICard include a valid arbitration agreement, a delegation clause, and a class action waiver provision. *See* Doc. 31. Plaintiffs concede that the arbitration provision should be enforced with respect to Wells Fargo, and that this case should be stayed with respect to Wells Fargo pending arbitration with it. *Id.* at 1. Plaintiffs contend, however, that they only agreed to arbitrate with defendant Wells Fargo; they did not agree to any arbitration provision with respect to Conduent. *See generally id*. This Court therefore must determine whether to compel arbitration as to Conduent. Because I find that plaintiffs agreed to arbitrate their claims only with respect to Wells Fargo, I GRANT the motion with respect to Wells Fargo but otherwise DENY it.

## II. Legal Standards

### A. Motions To Compel Arbitration

The framework for determining a motion to compel arbitration is similar to summary judgment practice. *BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017). "[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith." *Id*. On a motion to compel, the court must give the party opposing arbitration the benefit of all reasonable doubts and inferences. *Hancock v. Am. Tel. and Tel. Co., Inc.,* 701 F.3d 1248, 1261 (10th Cir. 2012). When there are no genuine issues of material fact regarding the agreement to arbitrate, the court may decide the arbitration

issues as a matter of law. *See id.*; *Avedon En'g, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir. 1997).

      B.   Federal Arbitration Act

The Federal Arbitration Act ("FAA") applies to arbitration provisions in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, such arbitration provisions "are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id*. "The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002).

The Supreme Court has described the FAA as "a liberal federal policy favoring arbitration," emphasizing that "the fundamental principle that arbitration is a matter of contract," and, accordingly, that "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. —, 139 S. Ct. 1407, 1415 (2019) ("The FAA requires courts to enforce arbitration agreements according to their terms.") (internal quotation and citation omitted). The FAA "was not enacted to force parties to arbitrate in the absence of an agreement." *Avedon*, 126 F.3d at 1286. Rather, Congress' concern "was to enforce private agreements into which parties had entered." *Id.* The FAA's policy of favoring arbitration acknowledges the FAA's commitment to overrule the judiciary's prior longstanding refusal to enforce agreements to arbitrate. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418–19 (2022). The FAA was enacted to place arbitration agreements on the same footing as other contracts. *Id.* "Accordingly, a court must hold a party to its arbitration contract just as the

court would to any other kind." *Id.* at 418.  "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon*, 126 F.3d at 1287.

### C. Arbitration is a Matter of Contract

Under the FAA, arbitration is matter of contract, and courts must enforce arbitration contracts according to their terms. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S.—, 139 S. Ct. 524, 529 (2019).  "Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration." *Waffle House*, 534 U.S. at 289.  The Court "cannot compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *Id.*  "Consent is essential under the FAA because arbitrators wield only the authority they are given." *Lamps Plus*, 139 S. Ct. at 1415.  The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.").

### D. The Court Decides Whether an Arbitration Agreement was Formed Between the Parties

The issue of whether an arbitration agreement was formed is decided by the Court. *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105–07 (10th Cir. 2020).  As the Tenth Circuit explained, "a court cannot order arbitration of a particular dispute unless it is satisfied that the parties agreed to arbitrate that dispute." *Id.* at 1106.  "[C]ourts must 'always' resolve 'whether the [arbitration] clause was agreed to' by the parties." *Id.* (quoting *Granite Rock Co. v.*

*Int'l Broth. of Teamsters*, 561 U.S. 287, 299 (2010)); *see also Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1242 (10th Cir. 2018) ("Gateway disputes include whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.") (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, (2003)). "Before granting a stay of litigation pending arbitration, a district court must determine that an agreement to arbitrate exists." *Avedon*, 126 F.3d at 1283 (citing 9 U.S.C. §§ 3, 4). "[W]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. "On a motion to compel arbitration, the district court's role is to determine (1) whether the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement." *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1189 (D.N.M. 2018).

**III.   Discussion**

The parties do not dispute that the Terms include an arbitration agreement and that the arbitration provision is valid and enforceable as between plaintiffs and Wells Fargo. *See* Doc. 29 at 13–14; Doc. 31 at 1. The parties dispute whether plaintiffs agreed to arbitrate with Conduent. *See generally* Doc. 31. For the following reasons, I find that plaintiffs did not agree to arbitrate with Conduent.

A.   <u>The Plaintiffs Did Not Enter into An Agreement to Arbitrate with Conduent</u>.

The Court must look to state law to determine whether plaintiffs agreed to arbitrate with Conduent. *See First Options*, 514 U.S. at 944. Here, the Terms have a governing law provision that provides,

> These Terms, the Card Account, the Card, and all transactions hereunder are subject to the laws of the United States, and to the extent applicable, the laws of the state of South Dakota without regard to conflict of laws principals.

Doc. 29-4. The Court, therefore, will look to South Dakota law to determine whether the plaintiffs formed an agreement to arbitrate with Conduent. Under South Dakota Law, the elements essential of a contract are: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration. *Winegeart v. Winegeart*, 2018 S.D. 32, ¶ 16, 910 N.W.2d 906, 911–12. "There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Id*. "Whether there is mutual assent is a fact question determined by the words and actions of the parties." *Id.*

The undisputed facts of this case establish that the arbitration agreement is between Wells Fargo and plaintiffs. Plaintiffs agree that the Terms are a contract between themselves, Wells Fargo, and Conduent, and that Conduent is a signatory to the contract as a whole. Doc. 31 at 4, 9. Plaintiffs contend, however, that Conduent "specifically excluded itself from arbitration of disputes." Doc. 31 at 9. I agree. The arbitration agreement states:

> If you have a dispute **with Bank**, and you are not able to resolve the dispute informally, **you and Bank** agree that upon demand by either of **you or Bank**, the dispute will be resolved by the arbitration process set forth in this Section. You understand and agree that **you and Bank** are each waiving the right to a jury trial or a trial before a judge in a public court. As the sole exception to this Arbitration Agreement, **you and Bank** retain the right to pursue in small claims court any dispute that is within the court's jurisdiction. If either **you or Bank** fails to submit to binding arbitration following a lawful demand, the one who fails to so submit bears all costs and expenses incurred by the other compelling arbitration.

Doc. 29-3 at 4; Doc. 29-4 (emphasis added). The Terms define "Bank" as Wells Fargo and "you" as the cardholder. Doc. 29-3 at 1; Doc. 29-4. The Terms further define a "dispute" as an "unresolved disagreement between you and Bank." Doc. 29-3 at 4; Doc. 29-4. The Terms provide a clear agreement between the cardholders (plaintiffs) and the Bank (Wells Fargo) to

arbitrate claims with the Bank. The arbitration provision, however, does not mention the "program manager" or Conduent. There is no evidence of mutual ascent between plaintiffs and Conduent with regard to arbitrating their disputes. The arbitration agreement simply does not include Conduent. Therefore, by its terms, the arbitration agreement does not give Conduent the ability to elect arbitration or to move to compel arbitration.

Defendants do not argue that a plain reading of the arbitration clause includes Conduent. Instead, they argue that (1) questions of arbitrability should be left to the arbitrator because the arbitration agreement contains a delegation clause, and (2) Conduent can enforce the arbitration agreement against plaintiffs pursuant to the doctrine of equitable estoppel. Doc. 29 at 15–17, 19–20; Doc. 32 at 7–12. These arguments are unavailing.

1. The Delegation Clause

Defendants contend that "the Court's inquiry ends upon a finding that there is a valid agreement to arbitrate because the Arbitration Agreements contain a delegation clause deferring the issue of the enforceability of the Arbitration Agreements to the Arbitrator." Doc. 29 at 15. The delegation clause provides that "[t]he arbitrator shall decide any dispute regarding the enforceability of the Arbitration Agreement." Doc. 29-3 at 4; Doc. 29-4. The Terms further state, "[a] dispute also includes any disagreement about the meaning, application or enforceability of this Arbitration Agreement." *Id.* While the arbitrator can decide all disputes, including enforceability, the Court, not the arbitrator, must decide whether there is an agreement to arbitrate in the first instance.

In *Granite Rock*, the Supreme Court found that a court cannot order arbitration of a particular dispute unless it is "satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock*, 561 U.S. at 297. "To satisfy itself that such agreement exists, the court must resolve any

issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id*.  As a practical matter, this makes sense because an arbitrator can act only after the parties agree to arbitrate, not before.  *See Lamps Plus*, 139 S. Ct. at 1415 ("Consent is essential under the FAA because arbitrators wield only the authority they are given.").  Consequently, the delegation clause does not govern whether an arbitration agreement was formed, but only arbitrability once the arbitration agreement is formed.

Defendants rely on *Henry Schein*, 139 S. Ct. at 529 (quoting *Rent-A-Center, Inc. v. Jackson*, 561 U.S. 63, (2010)) for the proposition that the parties may agree to have the arbitrator decide "gateway" questions of arbitrability such as "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."[2]  Doc. 29 at 16.  But as the Tenth Circuit has pointed out, the Supreme Court in *Rent-A-Center* found that "'[t]here is one caveat . . . [c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakeabl[e]' evidence that they did so.'" *Fedor*, 976 F.3d at 1106 (quoting *Rent-A-Center*, 561 U.S. at 69 n.1 (alterations in original) (quoting *First Options*, 514 U.S. at 944)).  The Tenth Circuit further explained,

> And while the *Rent-A-Center* Court held that a litigant must specifically challenge the delegation clause in order to allow courts to determine the validity of an arbitration contract as a whole, its holding does not apply in situations where a party alleges that no agreement "was ever concluded" between the parties.  [*Rent-A-Center* 561 U.S. at 70 n.2.]

---

[2] In *Henry Schein*, the Supreme Court addressed the appropriateness of certain circuit courts deciding that "the court rather than an arbitrator should decide the threshold arbitrability question if, under the contract, the argument for arbitration is wholly groundless."  139 S. Ct. at 529.  The Court explained that "[t]hose courts have reasoned that the 'wholly groundless' exception enables courts to block frivolous attempts to transfer disputes from the court system to arbitration."  *Id*.  The Supreme Court concluded that the "wholly groundless" exception is inconsistent with the text of the FAA and with Supreme Court precedent.  *Id*.  The Tenth Circuit did not adopt the "wholly groundless" standard, *see Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1286 (10th Cir. 2017), and whether the argument for arbitration is wholly groundless is not at issue in this case.

> Three days after *Rent-A-Center* was published, the Supreme Court reaffirmed its position that issues concerning the formation of an arbitration contract cannot be delegated to an arbitrator. In *Granite Rock*, the Court reversed the Ninth Circuit's judgment compelling the parties to arbitrate their claims even though the formation of the underlying arbitration agreement was at issue. 561 U.S. at 294–95, 313 [ ]. And while the arbitration agreement there did not include a delegation clause, the Court's "framework" for deciding the case shows that it would have found the dispute to be un-arbitrable even if a delegation clause was present. *See id*. at 297–99 [ ].

*Fedor*, 976 F.3d at 1106. Consequently, *Rent-A-Center's* holding does not apply here where plaintiffs allege that no agreement to arbitrate "was ever concluded" between plaintiffs and Conduent. *Id*. The Court cannot compel plaintiffs to arbitrate the arbitrability of their claims against Conduent under the delegation clause because there is no clear evidence that plaintiffs and Conduent ever formed an agreement to arbitrate anything. *See First Options*, 514 U.S. at 944.

      2.  Estoppel

Defendants argue that even if the Court determines that Conduent is not a party to the arbitration agreement, "[a]s an agent[3] of Wells Fargo for the purposes of administering the EPPICard program, the Conduent Defendants can enforce the Arbitration Agreements against Plaintiffs under estoppel theories." Doc. 29 at 20. Because arbitration agreements are like any other contract, "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego,

---

[3] Under South Dakota law, the "factual elements necessary to establish an agency relationship include[]: (1) manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *A.P. & Sons Const. v. Johnson*, 657 N.W.2d 292, 297 (2003). Defendants make no effort to show that Conduent, as a "subcontractor," also is an "agent" of Wells Fargo. *See* Doc. 29 at 20 (asserting without discussion that Conduent is an agent of Wells Fargo). But as discussed below, even assuming Conduent is an agent of Wells Fargo, Conduent cannot use equitable estoppel to compel plaintiffs to arbitrate their claims against it.

incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). As discussed above, South Dakota law applies, as do South Dakota's rules specific to arbitration agreements.[4]

"Under South Dakota law, a signatory can be forced to arbitrate against a non-signatory under principles of equitable estoppel in either of two circumstances." *White v. Sunoco, Inc.*, 870 F.3d 257, 264 (3d Cir. 2017). First, a signatory can be compelled to arbitrate against a non-signatory "when all the claims against the nonsignatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract." *Id.* (quoting *Rossi Fine Jewelers, Inc. v. Gunderson*, 2002 S.D. 82, ¶ 11, 648 N.W.2d 812, 815) (internal quotations omitted). The reasoning behind this rule is that plaintiffs should not be able to "avoid arbitration for which [they] had contracted simply by adding a nonsignatory defendant." *Id*. (alteration in original) (internal quotation

---

[4] Plaintiffs contend that "[d]efendants ask the Court to decide the issue by applying a unique federal equitable estoppel standard specifically designed to favor arbitration—rather than the traditional standard that governs equitable estoppel in every other context." Doc. 31 at 10. Plaintiffs assert that the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), instructs that "the high court has specifically held that a nonsignatory's attempt to use equitable estoppel to enforce someone else's arbitration clause should be evaluated under the 'traditional principles' of state contract law." Doc. 31 at 10. But the Court's holding in *Morgan* was narrower than plaintiffs suggest. Specifically, the Supreme Court held that federal courts must "apply the usual federal procedural rules" to determine whether a party to an arbitration agreement has waived its right to compel arbitration; they may not apply "custom-made rules[] to tilt the playing field in favor of (or against) arbitration." 596 U.S. at 419. But the Court said nothing to undermine its decision in *Arthur Andersen*, 556 U.S. at 631–32, where it "recognized that Chapter 1 of the FAA permits a nonsignatory to rely on state-law equitable estoppel doctrines to enforce an arbitration agreement." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. —, 140 S. Ct. 1637, 1644 (2020); *see also Reeves f. Enterprise Products Partners, LP*, 17 F4th 1008, 1011–12 (10th Cir. 2021) (applying Oklahoma state law to determine whether nonsignatory can compel arbitration under collateral estoppel theory); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) ("[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement."). Thus, *Morgan* is inapposite.

13

omitted). Second, a signatory can be compelled to arbitrate against a non-signatory when it asserts "claims arising out of agreements against nonsignatories to those agreements without allowing those defendants also to invoke the arbitration clause contained in the agreements." *Id.* "In other words, a plaintiff-signatory cannot have his cake (use the agreement against the non-signatory) and eat it too (avoid enforcement of the arbitration clause within the agreement)." *Id.* Neither circumstance is applicable in this case.

a) *Substantially Interdependent and Concerted Misconduct*

The South Dakota Supreme Court in *Rossi* held that non-signatories to an arbitration agreement could compel arbitration against a plaintiff where the plaintiff alleged "substantially interdependent and concerted misconduct" between the nonsignatory and the signatory to the agreement. 648 N.W.2d at 815–16. The *Rossi* court, however, did not precisely define "concerted misconduct," leaving courts without a clear standard as to when a plaintiff's claims qualify as alleging "interdependent" and "concerted" misconduct under South Dakota law. "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007) (internal citation and quotation omitted). In undertaking this endeavor, the Court may seek guidance from other relevant authorities, including lower court decisions, decisions from other states with similar legal principals, and district court decisions interpreting the law of the state in question. *Id*.

The United States District Court for the Central District of California addressed a similar issue in *Estrada v. The Moore Law Group, APC*, 2022 WL 2666924 (C.D. Cal. July 11, 2022) (unpublished) and collected cases addressing the meaning of "interdependent and concerted misconduct." *Id.* at *3–4. In *Estrada*, the court found that the jurisdictions that have adopted the

14

same concerted-misconduct test as South Dakota when considering compelling arbitration generally require that plaintiff allege that the signatory and non-signatory conspired in some way to commit the misconduct. *Id.*[5] Although *Estrada* is not binding, I am persuaded by that court's reasoning, and I agree that the South Dakota Supreme court would apply the concerted-misconduct test consistent with the authorities cited in *Estrada*. *See id*. Applying *Estrada's* interpretation of the concerted-misconduct test to the first amended complaint,[6] plaintiffs do not

---

[5] The *Estrada* court explained,

> For instance, in *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947–48 (11th Cir. 1999), the Eleventh Circuit applied this test and compelled the plaintiff to arbitrate its claims, when the plaintiff alleged the signatory and nonsignatory conspired to commit fraud. In contrast, in *Donaldson Co., Inc. v. Burroughs Diesel, Inc*., 581 F.3d 726 (8th Cir. 2009), the Eighth Circuit examined Mississippi equitable estoppel doctrine, which uses the same language as South Dakota's doctrine, and held that the plaintiff's allegations of shared misconduct were insufficient to allow the nonsignatory-defendant to compel the signatory-plaintiff to arbitrate. *Id*. at 734. The court applied the concerted-misconduct test to examine the plaintiff's claims and observed that the plaintiff did not allege the signatory and nonsignatory "'knowingly acted in concert,' 'improperly cooperated,' or 'worked hand-in-hand.'" *Id*.; *see also Pacanowski v. Alltran Fin*., 271 F. Supp. 3d 738, 748 (M.D. Pa. 2017) (applying *Donaldson* to South Dakota equitable estoppel doctrine). Perhaps most convincingly, in *White*, a case involving Citibank as a nonparty signatory and applying South Dakota law, the Third Circuit held that the nonsignatory-defendant could not compel arbitration because the signatory-plaintiff did not allege the defendant and Citibank conspired to commit fraud. 870 F.3d at 264–65.

2022 WL 2666924, at *3 (C.D. Cal. July 11, 2022).

[6] Defendants allege that plaintiffs improperly amended their complaint to avoid arbitration. Doc. 29 at 21–22. Plaintiffs respond that they amended their complaint to track "nearly verbatim" the information that defendants had provided in their own sworn statement. Doc. 31 at 6–7. I agree that the amendments to the complaint fairly represent the facts provided in defendants' declaration and are not improper. *Compare* Doc. 29-1 *with* Doc. 29-2; *see also* Doc. 31 at 6–7.

15

allege substantially interdependent and concerted misconduct between Wells Fargo and Conduent under South Dakota law.

In the first amended complaint, plaintiffs allege that Wells Fargo subcontracted with Conduent to fulfill nearly all aspects of its contract with New Mexico regarding the EPPICard program. Doc. 21 at 2, 6. Plaintiffs allege that Wells Fargo referred complaints regarding unauthorized electronic fund transfers and all other customer service issues to Conduent, and that Well Fargo placed all responsibility relating to the unauthorized transactions on Conduent. *Id*. at 8. Plaintiffs further allege that both Wells Fargo and Conduent did not conduct a good-faith investigation into the unauthorized transaction disputes, did not have a reasonable basis for believing that the EPPICard account transfers were not in error, and never refunded or issued credits for any of the money stolen from plaintiffs' EPPICard accounts. *Id*. at 10, 12. "However, the presence of allegations common to both the signatory and nonsignatory is not enough to satisfy the concerted-misconduct test." *Estrada*, 2022 WL 2666924, at *3.

The *Estrada* Court found that the plaintiffs must allege that the defendant signatory and defendant non-signatory either conspired, "knowingly acted in concert," "improperly cooperated," or "worked hand-in-hand" to commit the misconduct alleged. *Id*. Those types of allegations are absent from the first amended complaint. *See* Doc. 21. While plaintiffs allege that Wells Fargo's and Conduent's behavior was the same with regard to the alleged unauthorized debits, they do not allege that Wells Fargo and Conduent conspired or worked together in failing to remedy the alleged unauthorized transactions on plaintiffs' EPPICards. Conduent therefore cannot use the substantially-interdependent-and-concerted-misconduct estoppel theory to compel plaintiffs to arbitrate.

b) *Claims Arising Out of Agreements Against Non-Signatories*

The other way Conduent could invoke estoppel to compel arbitration is if plaintiffs were asserting claims arising out of the Terms. This is not the case. While plaintiffs refer to the Terms in their complaint, equitable estoppel requires that plaintiffs "assert[] a claim against a defendant based on an agreement." *White*, 870 F.3d at 265. As in *White*, plaintiffs' claims here do not rely on a breach of any of the provisions in the Terms and Conditions. *See id.* Instead, plaintiffs' claims arise from alleged violations of EFTA and the UPA. As plaintiffs explain, "[t]hese claims are based on obligations imposed on Defendants by federal and state law, not on the Terms and Conditions." Doc. 31 at 14. Conduent, therefore, cannot compel arbitration based on equitable estoppel for claims arising out of the agreement.

**IV. Conclusion**

For the reasons stated above, the Court finds that plaintiffs Ana Munoz and Michael Tilley agreed to arbitrate their claims against Wells Fargo and will compel arbitration with Wells Fargo. To the extent plaintiffs dispute the arbitrability of their claims or the application of any terms of the arbitration agreement, the arbitrator is tasked with deciding those disputes pursuant to the delegation clause.

The Court further finds that plaintiffs did not agree to arbitrate their claims against Conduent, and Conduent cannot invoke the doctrine of equitable estoppel to compel plaintiffs to arbitrate under the Terms. Because the arbitration agreement does not apply to Conduent, the arbitration procedure set forth in paragraph 20, including the provision preventing consolidated and collective actions against Conduent in paragraph 20.c. of the Terms, also does not apply to Conduent. *See* Doc. 29-3 at 4; Doc. 29-4.

IT IS THEREFORE ORDERED that defendants' motion to compel arbitration (Doc. 29) is GRANTED with respect to plaintiffs' claims against defendant Wells Fargo Bank, N.A., and this case is STAYED as to Wells Fargo pending that arbitration.  The motion is DENIED in all other respects.

                                              Laura Fashing
                                              United States Magistrate Judge
                                                 Presiding by Consent